# CITY COURT REPORTS.

## Marine Court.

*Trial Term—Nov.*, 1879.

## FREDERICK CYRUS ET AL. *against* HENRY PORTMAN.

**Wagering contracts illegal.—When a question of fact.—Rights of agent.** Where parties enter into a contract for the future delivery of goods, with the intent of performing the same in good faith, the contract is valid ; and the party failing to perform is liable for the difference between the contract price and the market rate. But if the transaction is a mere disguise for gambling it is illegal. If the parties never intended that the goods should be delivered, but that the difference between the contract price and the market rate should be paid, and that such difference should be settled on the day named, the transaction is a wagering contract and void.

The illegality in such case is matter of defense which must be pleaded, proved, and, in case of doubt and conflict, submitted to the jury.

If the contract be void on the ground stated the law will not even assist an agent in recovering his advances from his employer.

The plaintiffs sued the defendant to recover $235.50, a balance claimed to be due upon account stated. The complaint alleged that the plaintiffs rendered services

Cyrus *v.* Portman.

to the defendant at his request, in and about the procuring and carrying of contracts for the sale and also for the purchase of cotton, to be delivered at a future time for his account upon margin, and that the plaintiffs at like request paid, laid out, and expended moneys upon certain of said transactions, and that the defendant agreed to allow the plaintiffs a commission thereon.

The defendant pleaded that the transactions were pretended purchases and sales of contracts for the future delivery of cotton; that no cotton was ever purchased or sold, received or delivered, nor was it intended that cotton should be purchased, sold, received or delivered thereunder; that said contracts were not performed, and that the parties did not intend to perform them. That all that was ever contemplated was a settlement of the difference between the amount of the pretended purchase or sale, and the market price at the time when the pretended receipt or delivery was to be had; and that all of said transactions were merely wagers upon what the price of cotton would be at a future day, and that said transactions were in consequence void.

### JUDGE MCADAM'S CHARGE.

It appears that the plaintiffs and defendant in this action had various dealings together between August 8, 1877, and December 4, 1877, in the course of which the plaintiffs rendered services for the defendant in and about the procuring and carrying of contracts, for the sale, and also for the purchase of cotton to be delivered at a future time for his account upon margin put up by him, and that at his request, and for his account, and in pursuance of their employment, they paid out money for which the defendant agreed to allow and pay the plaintiff a commission upon the aforesaid transactions, at an agreed rate.

Cyrus v. Portman.

The plaintiffs claim, that thereafter, and on December 5, 1877, an account was stated between them and the defendant, and that, upon such statemant, a balance of $235.51 was found due from the defendant to the plaintiff, and for this amount they demand judgment.

The defense pleaded is, that the transactions had between the plaintiffs and defendant, at the times set forth by the plaintiffs, were pretended purchases and sales of contracts for the future delivery of cotton; that no cotton was ever purchased, sold, received, or delivered; that the contracts were never performed, and were never intended to be performed, and that all that was ever contemplated was the settlement of the difference between the amount of the pretended pur-chase or sale, and the market price at the time when the pretended receipt or delivery was to be had, and that the transactions were simply wagers upon what the price of cotton would be at a future day, and that any and all contracts between the plaintiffs and defend-ant growing out of said transactions, were illegal and void, being gambling contracts, prohibited by the stat-utes of the State.

Now were these *bona fide* transactions? were they real purchases of cotton, or cotton transactions, with the intention on the part of all the contracting par-ties, that the contracts, whatever they are, should be performed at maturity, that is, at the agreed time. If you find that they were real *bona fide* transactions, made with the intent stated, the plaintiffs are entitled to recover, otherwise not.

The court of appeals say (70 *N. Y.* 205), "Mercan-tile contracts of this character are not infrequent, and they are consistent with a *bona fide* intention on the part of both parties to perform them," or (p. 206), "They may be mere disguises for gambling, and where an optional contract for the sale of property is made, and there is no intention on the one side to sell

or deliver the property, or on the other to buy or take it, but merely that the difference shall be paid according to the fluctuation in market values, the contract is a wager within the statute, but th             is matter of defense, and must be established by proof and found by the jury." If you find, therefore, that the transactions in question, instead of being real, were mere devices to obviate, evade, or get around the statutes in regard to gambling wagers, I charge you that in that event, the contracts were void, and no recovery can be had in favor of the plaintiffs. The law upon this subject is plain. An English case holds that a contract for the sale and purchase of cotton, where neither party intends to deliver or accept the cotton, but merely to pay the difference, according to the rise or fall of the market, is void.

A Pennsylvania case holds that a contract to purchase shares of stock without the intention to deliver or receive them, but to pay the difference on a day certain, is a gambling contract, and not enforceable.

Similar rulings have been made by our supreme court, which have met the approval of the court of appeals. If, therefore, you find that these contracts were made in good faith, as I before remarked, and the parties intended to perform, the plaintiffs are entitled to recover, while on the other hand, if you find that an evasion of the statutes was intended, no recovery can be had.

Although the law does not invalidate actual business transactions, it strikes at everything that partakes of wagering or gambling, in whatever form it appears. Another question arises as to the effect of the statute upon persons who, like the plaintiffs, act as agents in such transactions. Judge STORY, in his work on Agency, says: "In respect to agencies in illegal transactions the same principles apply, as to advances and disbursements by agents, as apply to their

Cyrus *v.* Portman.

commissions, none are recoverable either in law or in equity. For the law will not assist any person in evading obligations imposed upon the whole community to conform to its directions and prohibitions. As between principal and agents in all such cases the guilt is deemed to be equal; and the maxim is *in pari delicto potior est conditio defendentis.*"

The parties, therefore, must trust exclusively to the personal faith of each other, as to the fulfillment of their mutual stipulations in illegal transactions.

The law will not assist the agent to recover his expenses or advances, or the principal to recover his property or its proceeds. Each party is left precisely where he is found at the time of the controversy, to bear the burden of his own abandonment of his duty to the law of his country.

If an agent should be employed to buy smuggled goods, and he should pay for the goods, and they should come to the hands of his employer, the agent could not recover for such advances from the employer.

So, if an agent should knowingly advance money to pay for illegal insurances, or for stock-jobbing transactions for his employer, he could not recover it from the latter.

So, if an agent should knowingly advance money to his employer to game with, it would not be recoverable.

Therefore, in conclusion, let me remind you that the case comes back to this : Were these transactions *bona fide*, made with the intention on the part of all the contracting parties to carry them out, in which case the plaintiffs are entitled to recover, or were they mere pretenses or disguises to avoid the statute against gambling wagers, by paying the difference according to the rise or fall of the market price of cotton ; for, in that event, the contracts were, as I have already intimated,

void, and the defendant will be entitled to your verdict.

The jury rendered a verdict for the plaintiffs for the amount claimed.

### Editorial comments.

It is now generally agreed, and indeed in this State is fully settled, that contracts on time for the sale of personal property—whether gold or other currency, stocks, bonds or merchandise,— are not void as wager contracts, merely because made for future delivery and at the option of one of the parties, nor because the seller did not have the wherewithal to fulfill. He who impeaches such a contract must show that it was the intention of the parties that it should not be fulfilled, but merely "settled" by payment of differences according to the course of the market.

Some difference of opinion exists as to what is the appropriate evidence of this intent. There is no question, at least in our courts, and probably not in any of those where parties are received as witnesses in their own behalf, that a party may be interrogated as to what was his intent in this respect at the time of making the contract. Proving the intent of one party, as Judge BRADY has well said, is one step toward proving the intent of both parties ; but it seems to be the better opinion that a common intent of both parties must be shown— certainly a secret intent of one is not enough. The courts have differed on the question how far the circumstances of a contracting party may be regarded as affording a legitimate presumption as to his intent in this respect. The fact that the buyer of an option in grain or stock was himself engaged in an entirely different business and without adequate means to pay the price fixed out of his own resources, has been held by some to be legitimate evidence that he never intended to require delivery. This question has probably sometimes been passed upon without adequate knowledge of the course of trade and of the extent to which optional contracts are used in actual transfer. The impecuniosity of a party might be a very good reason for doubting whether he intended to fulfill the contract unaided on his own account, and yet be too remote to justify an inference that he intended a gambling contract. Such facts, not communicated to the other party at the time, may be deemed, like a secret intent of one party, irrelevant, and this view would accord with the rule settled in our courts as to the competency of such evidence on the question to whom of several persons credit was given on a sale. In such a case, evidence that one had no property and was entirely irresponsible is

Cyrus v. Portman.

inadmissible, because it is too remote to justify a presumption that the credit was not given to him notwithstanding ; but this is not inconsistent with the ruling by the same court, that it is competent to show that the insolvency was communicated to the party who gave the credit, and treated by him as a reason for giving it, not to the insolvent, but to some other.

Compare Rumsey v. Berry, 65 Me. 574 ; Kirkpatrick v. Bonsal, 72 Penn. St. 755 ; In re Green, 7 Bill. 338.—From Daily Register, Feb'y 24, 1880.

An interesting question, arising on contracts for the sale of grain, settled by payment of differences, has recently been passed on by Judge GRESHAM, in the United States circuit court for Indiana.   It has already been well settled in previous cases that a contract, which on its face does not bear any indication that it was not intended to call for actual delivery, is presumed to have been an actual purchase or sale, and, though optional, is valid until the party impeaching the contract shows an illegal intent.   The interesting question now frequently mooted in cases of this character is as to what evidence will show the intent, and particularly whether the fact that the contract was actually settled by adjustment of differences or that there was a usage to do so, necessarily shows it to have been illegal, or suffices to raise a legal presumption that the intent to make such a settlement existed in the inception of the contract.   In the case before Judge GRESHAM this point was put in a very clear light, and he ruled, in a charge to the jury, after argument by able counsel, that such a usage did not necessarily make the contract void.

The testimony tended to show that a general custom obtained among grain commission merchants in Baltimore to the following effect : When one commission merchant, upon the order of a customer, sells to another commission merchant a quantity of grain for future delivery, and where it occurs that at some other time before the maturity of the contract, the same commission merchant receives an order from another customer to purchase the same or a larger quantity of the same kind of grain, for the same future delivery, and he executes this second order by making the purchase from the same commission merchant to whom he had made the sale in the other case, that then in such case the two commission merchants meet together and exchange or cancel the contracts as between themselves, adjusting the difference in the prices between the two contracts, and restoring any margins that may have been put up, and that, from that time forth the first commission merchant holds for the benefit of the customer for whom he sold, the order or contract of the purchaser for whom he bought, so that the wheat of the selling customer may,

Cyrus v. Portman.

when delivered, be turned in on the order or contract of the purchas-
ing customer, and that the commission merchant is held responsible as
guaranty to his customer.

The evidence further tended to show a custom obtaining among
commission merchants in Baltimore to the further effect, that though
the second transaction may have been had with a different commis-
sion merchant from the one with which the first transaction was had,
yet where it can be found that a series of contracts are in existence for
the sale of like grain, for like delivery, so that the seller owes the
wheat to the buyer to whom he sold, and he to another, who owes like
wheat for like delivery to the first commission merchant, that then in
such case they settle by what they call "a ring"—that is, they all
reciprocally surrender or cancel their contracts, adjust the price dif-
ferences between themselves, and surrender all margins that had been
put up.    That in all such cases the commision merchant substitutes
the contract of another customer in place of that with the commission
merchant whose contract has been canceled or surrendered, and that
he guarantees to his customer the performance of the contract origi-
nally made on his behalf.

The judge instructed the jury that these customs were founded in
commercial convenience ; that they are not in contravention of the
law, and that they are valid.

He also charged them that the burden of showing that the parties
were carrying on a wagering business, and were not engaged in legit-
imate trade or speculation, rests upon the defendant.    On their face,
these transactions are legal, and the law does not, in the absence of
proof, presume that parties are gambling.  A person may make a con-
tract for the sale of personal property for future delivery which he
has not got.    Merchants and traders often do this.    A contract for
the sale of personal property which the vendor does not own or pos-
sess, but expects to obtain by purchase or otherwise, is binding if an
actual transfer of property is contemplated.    A transaction, which on
its face is legitimate, cannot be held void as a wagering contract by
showing that one party only so understood and meant it to be.    The
proof must go further, and show that this understanding was mutual
—that both parties so understood the transaction.    If, however, at
the time of entering into a contract for the sale of personal property
for future delivery, it be contemplated by both parties that at the time
fixed for delivery the purchaser shall merely receive or pay the differ-
ence between the contract and the market price, the transaction is a
wager, and nothing more.    It makes no difference that a bet or wager
is made to assume the form of a contract (*From Daily Reg.* April 2,
1880 ; citing 12 *Chic. L. N.* 241).

Cyrus v. Portman.

When the magnitude of purchases of stock made by a broker is out of all proportion to the money advanced by the principal to pay therefor, the transaction is stamped with the character of a gambling enterprise, and the law will not enforce payment amongst the parties thereto (Patterson's Appeal, *S. S. of Penn.*).

## Wagering contracts.

To render a contract for the purchase and sale of property void as a wagering contract, it must appear to have been the understanding when the contract was made, that the property should not be delivered, and that only the difference in the market price should be paid or received (Kingsbury *v.* Kirwin, 77 *N. Y.* 612). An agreement upon good consideration, by A. to purchase from or sell to B., at the latter's option, a given number of shares of stock within a limited time, at a given price, is not in itself a gaming contract (Story *v.* Salomon, 71 *N. Y.* 420). That a straddle contract in stocks was a wager and void, must be proven in the particular case (Harris *v.* Tumbridge, 83 *N. Y.* 92). See also *Abbott's New Digest,* vol 7, Supplement, p. 422, etc. As to Pools and Syndicates, see same ; *Dos Passos on Stock Brokers, etc.* See article on Curiosities in the Law of Wagers, 11 *Cent. Law J.* 184.

## Distinction between wager and premium.

In a wager there must be two parties, and it is known, before the chance or uncertain event upon which it is laid is accomplished who are the parties that must either lose or win. For a premium there is but one party until the act or thing or purpose is offered has been accomplished. A premium is a reward and recompense ; a wager is a stake upon an uncertain event. In a premium it is known who is to give before the event ; in a wager it is not known until after the event. Wagers are unlawful, premiums legal (11 *Central Law J.* 238). Purses, prizes and premiums on horse races are legal, they are not wagers (Harris *v.* White, 81 *N. Y.* 532). And a jockey's contract to drive horses in races is not illegal (*I b.*).

## As to contracts for sale of coin,

See 7 *Abbott's New Digest,* Supplement, 433.

## Prize packages.

A sale of " prize packages," some of which contained orders for silver-ware,—Held, a lottery, and an action therefore cannot be maintained for the price (Hill *v.* Ruggles, 56 *N. Y.* 424).

Cyrus *v.* Portman.

### Brokers' law and Ringing Out.

An important case to partners and to stock and produce brokers, and conveyancers having occasion to draw contracts relating to such business, is that of Irwin *v.* Williar (U. S. Supreme Court, March, 1884, 110 *U. S.* [Davis], 449), where the question was as to the liability of partners to a broker, employed by one of the firm in dealing in futures, and the rights of brokers transacting business for their customers by the process of "ringing out."

The brokers brought the action for a balance claimed due on sales made by them, had, at the request of the defendants, Irwin and Davis, made certain contracts for the sale and future delivery of grain ; that these contracts were made in the name of the brokers, on which, therefore, they were personally liable, but in which Irwin and Davis were the principals ; that the latter were bound to perform them, or place in the hands of their brokers means of performing within the proper period, or to indemnify them against the consequences of non-performance ; that Irwin and Davis in all these particulars became in default, and the plaintiffs were required to perform out of their own means, which they did by purchasing grain for delivery at the market price, or paying the difference between that and the contract price.

Plaintiffs proved the custom as to settling contracts by "ringing out," an operation in which the brokers' clerks imitate an algebraic process, and arrive at a solution of a long equation of futures by striking out the intermediate terms, and bringing together the first and last contract. In this way the plaintiffs, having sold grain for future delivery on account of their customers, had substituted the ultimate contract in a long succession for the one immediately made, holding themselves responsible to guarantee the performance of this purchase according to the usages of the trade. It did not appear that the customers had notice of this method of substituting one purchaser for another, and the court held that on this ground the brokers could not recover.

There was another question in the case, also of general interest, the conclusions of the court on which are well stated in Mr. Davis' head-notes, as follows:

A contract of partnership for the buying of grain, both wheat and corn, and its manufacture into flour and meal, and the sale of such grain as might accumulate in excess of that required for manufacturing, and the use, with the knowledge of all the partners, in the partnership business, of cards and letter-heads describing the firm as millers and dealers in grain, do not necessarily imply, as matter of law, authority to deal in the partnership name in futures by means of

Cyrus v. Portman.

contracts of sale or purchase, for purposes of speculating upon the course of the market, and to bind the partnership thereby.

Dealing in futures by means of contracts of sale or purchase for purposes of speculating upon the course of the market is not, as matter of law, an essential characteristic of every business to which the name of dealing in grain may properly be assigned.

If, under guise of a contract to deliver goods at a future day, the real intent be to speculate in the rise or fall of prices, and the goods are not to be delivered, but one party is to pay to the other the difference between the contract price and the market price of the goods at the date fixed for executing the contract, the whole transaction is nothing more than a wager, and is null and void.

When a broker is privy to such a wagering contract, and brings the parties together for the very purpose of entering into the illegal agreement, he is *particeps criminis*, and cannot recover for services rendered or losses incurred by himself in forwarding the transaction (*From the Daily Register*, May 5, 1884).

### Lotteries.

Lotteries are forbidden (3 *R. S.* 6th ed. 922), and are "a common and public nuisance" (Grover *v.* Morris, 73 *N. Y.* 476). Lotteries are in their nature prejudicial to the public morals (Stone *v.* State of Mississippi, 10 *Cent. L. J.* 440 ; 1 *Ky. L. R.* 146). In this case WAITE, Ch. J., said : " That they are demoralizing in their effects, no matter how carefully regulated, cannot admit of doubt." In Phalen *v.* Virginia (8 *How. U. S.* 168), Judge GRIER said : "Experience has shown that the common forms of gambling are comparatively innocuous when placed in contrast with the widespread pestilence of lotteries. The former are confined to a few persons and places, but the latter infests the whole community ; it enters every dwelling ; it reaches every class ; it preys upon the hard earnings of the poor ; it plunders the ignorant and simple." Leases made for sale of policy slips void (See Shaw *v.* McCarthy, 59 *How. Pr.* 487 ; 62 *Id.* 152 ; Edelmuth *v.* McGarren, 4 *Daly*, 467 ; Hegley *v.* Devlin, 12 *Abb. N. S.* 210 ; Rolfe *v.* Delmar, 7 *Rob*, 80).